428 S.E.2d 779

**Josephine FINDO, Plaintiff Below, Appellant,**

v.

**Robert B. HAMILTON, M.D., Defendant Below, Appellee.**

**No. 21264.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 20, 1993.

Decided March 26, 1993.

Michael Tomasky, Gary Wigal, Morgantown, for appellant.

Herbert G. Underwood, Karen Kahle, Steptoe & Johnson, Clarksburg, for appellee.

PER CURIAM:

This is an appeal by Josephine Findo from a January 8, 1992, order of the Circuit Court of Marion County which granted summary judgment in favor of the Appellee, Robert B. Hamilton, M.D. The Appellant contends that summary judgment was inappropriately ordered and seeks reversal of the order of the circuit court. We find no reversible error and affirm.

## I.

On September 9, 1986, Appellant Josephine Findo was admitted to Fairmont General Hospital with a fever and stomach cramps. Her physician of 28 years, Dr. Robert B. Hamilton, treated her for acute diverticulitis and perforation of the colon and discharged her on September 23, 1986. In October 1987, the Appellant was admitted to Monongalia General Hospital in Morgantown. She was hospitalized on several occasions from October 1987 through January 1992 for surgical procedures necessary to correct damage allegedly caused by Dr. Hamilton's failure to appropriately treat the Appellant's condition in 1986.[1]

A complaint was filed on January 8, 1991, against Dr. Hamilton alleging medical malpractice. During a November 1, 1991, deposition of the Appellant, she testified that Dr. Lorraine Tyre had informed her in October 1987 that Dr. Hamilton did not provide her with the proper medical treatment. Based upon this testimony, the Appellant's complaint was dismissed on January 8, 1992, on the grounds that she

1. The Appellant was hospitalized on October 2, 1987; October 6 through October 7, 1987; October 7 through October 25, 1987; November 29 through December 3, 1987; April 11 through April 20, 1988; July 27 through August 3, 1988; January 26 through February 2, 1989; and January 1992. Due to persistent infections resulting from the perforated colon, the Appellant's internal organs are currently held in place by a surgically implanted mesh material.

had discovered the Appellee's alleged malpractice in October 1987 and had not filed her complaint within the two-year statute of limitations. The Appellant now appeals that determination and contends that a question of fact still exists as to the date on which the statute of limitations should have begun. The Appellant now contends that she did not have sufficient awareness of the Appellee's malpractice until August 1989 when a medical expert first informed her that the treatment rendered by Dr. Hamilton was negligent.

## II.

Pursuant to the Medical Professional Liability Act, specifically West Virginia Code § 55–7B–4(a) (Supp.1992), an injured plaintiff's cause of action "must be commenced within two years of the date of such injury, or within two years of the date when such person discovers, or with the exercise of reasonable diligence, should have discovered such injury, whichever last occurs...." The Appellant urges us to recognize the distinction between discovery of a physical manifestation of damage resulting from malpractice and the malpractice itself, i.e., it is possible to discover an injury without recognizing that malpractice was committed. The Appellant further asserts that the statute of limitations should not begin to run until the Plaintiff becomes aware that the action in question constituted malpractice. The Appellant cites *Renner v. Asli*, 167 W.Va. 532, 280 S.E.2d 240 (1981), in support of this position. In *Renner*, the lower court had granted the defendant's motion for summary judgment on the basis of the plaintiff's deposition statement regarding her first awareness that her physician had " 'messed up' " her arm. *Id.* at 535, 280 S.E.2d at 242. We reversed, explaining the following:

> We do not believe that plaintiff's knowledge of her condition from her own observation, and that acquired from her physicians, was sufficient to justify a determination, as a matter of law, that she knew of the defendant's negligence in his treatment of her more than two years before she instituted the action.

*Id.* at 534, 280 S.E.2d at 242. We further determined that the "injury" was discovered on the date the plaintiff realized that she was a victim of medical malpractice.

> The central malpractice question was whether an earlier operation on the ulnar nerve would have prevented the plaintiff's subsequent claw-like hand and loss of her fifth finger. Until plaintiff was informed that a prompt operation on the ulnar nerve would have prevented her claw-like hand and subsequent amputation of her fifth finger, she had not 'discovered' the malpractice. There is no conclusive information on this fact in discovery material and consequently summary judgment was inappropriate.

*Id.* at 535–36, 280 S.E.2d at 242.

■ We agree, in theory, with the Appellant's interpretation of the knowledge necessary to prompt the running of the statute of limitations. In her case, the statute did not begin to run when she merely discovered that additional treatment could possibly have been provided or that Dr. Hamilton could have treated her more aggressively. Rather, as in *Renner*, the statute began to run when the Appellant affirmatively recognized that malpractice had been committed. An exhaustive analysis of the record, however, must be conducted in order to discover the moment at which the Appellant gained such knowledge. By her own testimony, the Appellant acknowledged that she discovered Dr. Hamilton's alleged negligence in October 1987. With regard to an appointment with Dr. Tyre in October 1987, the record reveals the following exchange:

Q. "Did Dr. Tyre tell you that what Dr. Hamilton did was malpractice and not proper treatment?"

A. "Um–Hmn, that's what she told me."

Elsewhere in her testimony, however, the Appellant contends that she could not recall exactly what Dr. Tyre told her. The Appellant asserts that this uncertainty raises an issue of material facts precluding summary judgment and requiring the taking of additional evidence. A review of

pertinent portions of the deposition testi- mony is therefore warranted.[2]

2.  Q.  Has any physician, any nurse, or any health care person that you've gone to be treated by, have they ever advised you or criticized the care that Dr. Hamilton provided to you in any way?
    A.  Well, I don't remember that.
    Q.  Did any physician ever tell you that Dr. Hamilton did anything wrong when he treated you in 1986?
    A.  I don't remember that. I just know that he did—I was just in the hospital, but he didn't—that's when I was sick, and he didn't do no surgery then and he didn't have me on no diet, and I kept vomiting all the time in '86. He claims I had diverticulitis in '86.
    . . . .
    Q.  Did Dr. Tyre ever criticize or tell you that Dr. Hamilton did anything wrong?
    A.  Um-hmn. She said he should have did my surgery in '86; I think that's what she told me.
    Q.  When did Dr. Tyre advise you of that?
    A.  '87, when I come to my—see, I didn't know nothing for—until after the operation. That's when she told me I should have had it done—Dr. Hamilton should have did that.
    Q.  I just need to be sure I am clear on your testimony here today.
    A.  Okay.
    Q.  Dr. Tyre advised you in 1987?
    A.  Yeah, that I should have had that done in '86, I think she said, I wouldn't have had all this trouble.
    Q.  That you should have had the surgery in '86?
    A.  Um-hmn, when I was in the hospital.
    Q.  And you are absolutely clear about that, those dates?
    A.  I think it was '85 or '86. You mean when I was in the General?
    Q.  What I want to know is what Dr. Tyre told you or advised you pertaining to Dr. Hamilton's care?
    A.  She said that I should have had that done '86 or '85, my surgery. But he didn't do—do you want me to tell what he did at the hospital when I was there in '86?
    . . . .
    Q.  You've testified that Dr. Tyre advised you that Dr. Hamilton did something wrong.
    A.  Yes. I think she said I was supposed— I'm not sure, my son would know, I think she told me I should have had this done in '85 or '86, or I wouldn't have had—I wouldn't have got sick in '87.
    Q.  Dr. Tyre treated you in 1987 during your surgery at Mon General?
    A.  She did my surgery. They took me down there in an ambulance, and I don't remember going down there. My son does; my two sons took me. And she said I should have had this done in '85 or '86, the surgery what I had in '87.
    Q.  And she advised you of that in 1987 when you had your surgery?

    A.  I think she did. You mean—yeah, when I had my surgery in '87.
    Q.  Dr. Tyre advised you at that time—
    A.  Um-hmn.
    Q.  —that Dr. Hamilton—
    A.  Should have—.
    Q.  —should have done something differently?
    A.  Um-hmn. Should have did my surgery in '86, yeah, '86 when I was in or I wouldn't have had all this trouble, you know.
    Q.  Do you recall when that conversation with Dr. Tyre occurred—what date or where you were at that time?
    A.  I was in the hospital when she told me.
    Q.  In Mon General Hospital?
    A.  Um-hmn.
    Q.  In October of 1987?
    A.  Um-hmn.
    . . . .
    A.  I was delirious about a week, I think, or ten days. I didn't know anything until after I come to mind, yeah.
    Q.  But you recall a conversation with Dr. Tyre during that time—
    A.  Yes.
    Q.  —during that October of 1987 hospitalization?
    A.  Um-hmn, yes.
    . . . .
    Q.  Do you recall the conversation in detail; that is, exactly what Dr. Tyre told you during your hospitalization at Monongalia General Hospital regarding Dr. Hamilton?
    A.  Um-hmn.
    Q.  What did she tell you?
    A.  I think she said I should have had that surgery done in '87—or '86 when I was in there, and he didn't do it.
    . . . .
    Q.  Now, you're certain that when Dr. Tyre advised you that Dr. Hamilton should have done the surgery in '86, you're certain that occurred—
    A.  I think so, um-hmn.
    Q.  —when you were in the hospital? You need to say yes or no.
    A.  I don't remember, but I believe so; I won't say for sure. I think that's when she told me I should have had that done in '87 or '86.
    Q.  Did Dr. Tyre tell you in 1987 that Dr. Hamilton committed malpractice and what he did was wrong?
    A.  Let me see, I think she said that I was supposed to have that done in '87 or '86 when I was in there, but he didn't do anything when I was in the hospital.
    . . . .
    Q.  And after Dr. Tyre then advised you in 1987 while you were at Monongalia General Hospital that Dr. Hamilton didn't do—
    A.  What he was supposed to do.
    Q.  —what he was supposed to do, is that why you decided not to return to him as your physician?

■ A review of the Appellant's testimony leads to the inescapable conclusion that she was informed by Dr. Tyre in October 1987 that Dr. Hamilton's actions constituted malpractice. While some excerpts from the transcript do indicate the Appellant's confusion about particular aspects of her discussions regarding Dr. Hamilton's treatment, she repeatedly answers in the affirmative when questioned as to whether she was told in October 1987 that Dr. Hamilton's actions constituted malpractice. In addressing a similar evidentiary issue in *Renner*, we explained that there was "no conclusive information" in the discovery regarding exactly when the plaintiff was informed that a previous operation could have prevented certain injuries. 167 W.Va. at 536, 280 S.E.2d at 242. In syllabus point 1 of *Renner*, we explained the following: " '[t]he question of when plaintiff knows or in the exercise of reasonable diligence has reason to know of medical malpractice is for the jury.' Syl. pt. 1, *Harrison v. Seltzer*, [165] W.Va. [366], 268 S.E.2d 312 (1980), *quoting*, Syl. pt. 4, *Hill v. Clarke*, [161] W.Va. [258], 241 S.E.2d 572 (1978)." That statement, however, necessarily assumes that a legitimate question is raised during the proceedings as to the time knowledge was acquired. The principles requiring presentation to the jury need not be stretched to absurdity. Certainly, as we acknowledged in *Renner*, "[w]e do not mean to suggest ... that summary judgment is never proper in a medical malpractice case. We merely hold that summary

judgment was not proper in this case in view of the evidence." 167 W.Va. at 536, 280 S.E.2d at 243.

■ Similarly, in *Harrison*, we found summary judgment inappropriate because a factual issue existed as to whether the physician who had been sued for malpractice had informed the plaintiff of essential medical information. 165 W.Va. at 373, 268 S.E.2d at 315. In the present case, however, we have the Appellant's own testimony regarding the moment at which she learned of Dr. Hamilton's malpractice. Indeed, we are confronted with that direct testimony indicating knowledge in October 1987 of Dr. Tyre's opinion regarding Dr. Hamilton's malpractice. In light of such specific testimony by the Appellant, we are unable to find reversible error by the lower court. The lower court correctly recognized the dilemma here and determined that the Appellant's own testimony rendered it impossible to conclude that the Appellant had filed her claim within the statute of limitations. The Appellant contends that the confusion or uncertainty evidenced during her deposition creates a genuine issue of material fact to be resolved by a jury. In syllabus point 2 of *Renner*, we recognized the following:

'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application

A. Because he never treated me right. Well, when I had all these pains, I had these pains for several years, and he said it was only arthritis and that was what I was taking—. It wasn't arthritis.
Q. Did Dr. Tyre tell you that what Dr. Hamilton did was malpractice and was not proper treatment?
A. Um-hmn, that's what she told me.
. . . .
Q. Is it your testimony here today that Dr. Tyre told you—
A. Yes.
Q. —during that hospitalization in October of 1987 that Dr. Hamilton—
A. Should have did this in '87 or '86, the surgery, what she did.
Q. —should have performed the surgery in 1986 or 1987?
A. Um-hmn, that's true.

Q. Is it because of those statements by Dr. Tyre that you decided not to return to Dr. Hamilton as a treating physician?
A. Well, I don't think he was a good doctor and he wasn't treating me right.
Q. Was it also because of what Dr. Tyre told you?
A. No, I just thought he wasn't a good doctor and he didn't know what he was doing when he was giving me arthritis pills if I have this diverticulitis—when I had this stomach trouble.
. . . .
Q. You are certain that you were advised by Dr. Tyre during your hospitalization at Monongalia General Hospital in October of 1987 that Dr. Hamilton did something wrong and didn't treat you as he should have treated you.
A. That's true.

of the law.'  Syl. pt. 3, *Harrison v. Seltzer*, [165] W.Va. [366], 268 S.E.2d 312 (1980), *quoting*, Syl. pt. 3, *Aetna Casualty and Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

After thorough review of the record, we cannot conclude that the lower court committed reversible error in determining that no genuine issue of material fact existed and that summary judgment was appropriate.  Thorough inquiry into the facts was made during the Appellant's deposition.

That inquiry revealed that the statute of limitations had expired prior to the filing of the Appellant's claim.  Consequently, we cannot conclude that the lower court erred in so ruling.

Affirmed.